FILED
CLERK, U.S. DISTRICT COURT

July 14, 2015

CENTRAL DISTRICT OF CALIFORNIA
BY: _____PMC_____ DEPUTY

1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          CENTRAL DISTRICT OF CALIFORNIA

10

11    EUTIQUIO ACEVEDO MENDEZ, et al.,        )    CASE NO. 2:13-cv-09042-SVW-AJW
                                              )
12              Plaintiffs,                   )    ORDER GRANTING NON-PARTY
                                              )    MEDIA ORGANIZATIONS' MOTION
13              v.                            )    TO INTERVENE AND UNSEAL
                                              )    DOCUMENTS
14    THE CITY OF GARDENA, et al.,            )
                Defendants.                   )
15                                            )
                                              )
16                                            )
                                              )
17    _____ )

18    I.      INTRODUCTION

19          This civil rights action arose when police officers' detention of suspected bicycle thieves

20    turned into a shooting spree—resulting in several injuries and the death of one plaintiff.

21          Presently before the Court is a motion filed by non-party media organizations Los

22    Angeles Times Communications LLC, The Associated Press, and Bloomberg, L.P. (collectively,

23    "Media Organizations") to intervene for the limited purpose of requesting the unsealing of video

24    footage submitted by the parties in connection with a motion for summary judgment.  (Dkt. 248.)

25    The Media Organizations move to unseal the subject video footage on First Amendment

26    grounds, asserting the public's interest in accessing this footage.

27          The motion at bar requires the Court to decide whether to unseal video footage taken by

28    police officers' car cameras—thus granting non-party media organizations and the public access

to footage of the shooting and surrounding events.  This issue arises against a backdrop of tension and heightened scrutiny in the wake of several widely publicized and controversial uses of force by the police.  There is currently an intense public debate about police officers' use of force and public oversight thereof.  The Court is sensitive to the valid concerns raised by both sides of this debate.  Nevertheless, it is not the function of the judiciary to decide political issues.  Instead, this Court is bound to apply the laws enacted by the legislature and expounded by the higher Courts.  As discussed below, while the political issues may be murky, the law here is clear.  For the reasons discussed below, the Court GRANTS the Media Organizations' motion to intervene and unseal the video footage.

## II.    BACKGROUND

### A.    Facts[1]

According to Plaintiffs: On June 2, 2013, Agustin DeJesus Reynoso's ("Reynoso") bicycle was stolen from a CVS Store.  (Dkt. 214: Pls.' Opp., 2.)  A security guard called 911 and reported that a customer's bicycle had been stolen by two men.  (*Id.* at 3.)  Reynoso called his brother, plaintiff Zeferino, either to see if he had taken the bicycle or to tell him it was stolen.  (*Id.*)  Reynoso waited at the CVS for the police to respond while Zeferino, Mendez, and Amado returned home—Mendez and Amado on their bicycles, with Zeferino behind them on foot.  (*Id.*)

Cuff encountered Mendez and Amado on Redondo Beach Boulevard.  (*Id.* at 3–4.)  Cuff detained Mendez and Amado.  (*Id.* at 4–5.)  Zeferino approached the group while Cuff detained Mendez and Amado.  (*Id.*)  Plaintiffs claim that Zeferino told Cuff that Mendez and Amado were not the "right guys."  (*Id.* at 5.)

Two more police cars, carrying Officers Mendez, Toda, and Sanderson, pulled up to the scene.  (*Id.*)  The three officers emerged from their cars, and each officer pointed his gun at the three Plaintiffs.  (*Id.*)  Plaintiffs allege that Mendez and Amado were standing with their hands over their head when police officers opened fire.  (*Id.* at 6.)  They further allege that Zeferino was holding his hat in one hand and was displaying the open palm of his other hand when police

---

[1]  The Court here recites the parties' versions of the facts, as recounted in their briefs regarding Defendants' motion for summary judgment, solely to provide context.  This Court does not here engage in factfinding.

1   fired. (*Id.* at 7–8.)  Three of the four police officers on the scene (all except Cuff) fired their

2   weapons. (*Id.*)  Plaintiffs assert that the shooting was unjustified and wrongful.  Both Zeferino

3   and Mendez sustained gunshot wounds. (*Id.* at 1–2.)  Zeferino ultimately died from his wounds.

4   (*Id.* at 1.)

5        According to Defendants: When the CVS security guard called 911, the dispatch operator

6   issued a three alert tone followed by a dispatch to Cuff of a robbery that had occurred 15 minutes

7   prior. (Dkt. 152: Defs.' Mem. P. & A., at 1.)  The three alert tone purportedly indicated that a

8   high priority call was in progress that needed immediate attention. (*Id.*)  Cuff claims that he

9   responded to the dispatch and almost immediately saw two men traveling on bicycles on the

10  same direction on the same road that the dispatch said the suspects were last seen traveling. (*Id.*

11  at 1–2.)  Cuff asserts that he detained Mendez and Amado, re-entered his car to turn on his video

12  recorder and lights, and then heard Dispatch give a physical description of the suspects (which

13  was somewhat consistent with Mendez and Amado). (*Id.* at 2.)  Cuff told Dispatch that he had

14  the suspects, and emerged from his vehicle with his gun drawn. (*Id.*)

15       Defendants allege that Cuff gave Amado and Mendez instructions in Spanish and

16  English, but that the two men were only partially compliant. (*Id.*)  Defendants assert that

17  Zeferino approached the group within 90 seconds of Cuff detaining Amado and Mendez, and

18  that Zeferino failed to comply with Cuff's orders to raise his hands. (*Id.* at 2–3.)  Defendants

19  assert that the other three officers arrived on the scene 60–90 seconds thereafter. (*Id.* at 3.)  The

20  officers assert that Zeferino refused to comply with orders to raise his hands and took two

21  "threatening" steps toward Cuff. (*Id.* at 3.)  They claim that Zeferino removed his hat from his

22  head and swung his right hand to his waist, causing them each to fear for their safety and thus to

23  fire their weapons at Zeferino. (*Id.* at 3–4.)  They assert that Mendez was shot accidentally. (*Id.*

24  at 3.)

25       **B.      Procedural History**

26       On August 7, 2014, plaintiffs Eutiquio Acevedo Mendez ("Mendez"), Ricardo Diaz

27  Zeferino ("Zeferino"), Jose Amado Garcia ("Garcia"), Juan Jesus Diaz ("Diaz"), and Bonifacia

28  M. Zeferino ("Bonifacia") filed their First Amended Complaint ("FAC") against defendants City

1    of Gardena, Gardena Police Department ("GPD"), Chief Edward Medrano ("Medrano"), Sgt.

2    Christopher Calvin Cuff ("Cuff"), Officer Christopher Anthony Mendez, Officer Christopher

3    Andrew Sanderson ("Sanderson"), and Matthew Steven-Fong Toda ("Toda").  (Dkt. 1.)  The

4    FAC asserts claims for (1) excessive force in violation of 42 U.S.C. § 1983; (2) "Supervisor

5    Liability Causing Constitutional Violations"; (3) unconstitutional "Custom, Policy or Practice"

6    in violation of § 1983; (4) "Assault, Battery and Wrongful Death"; (5) "False Arrest/False

7    Imprisonment"; (6) negligence; and (7) violation of California Constitution Article 1, Section 13.

8    (Dkt. 58.)

9          Discovery disputes arose early in this case and were extensively litigated.  On February

10   17, 2014, Defendants sent Plaintiffs a proposed joint stipulation to stay proceedings pending

11   completion of the Los Angeles Count District Attorney's Investigation.  *See* (Dkt. 20-1: Joint

12   Stipulation, at 5.)  On February 21, 2014, Defendants represented that when they produced the

13   "homicide book," they would seek a protective order because some of the documents therein

14   were confidential.  (*Id.*)  Defendants suggested that the parties work on a joint stipulation for a

15   protective order.  (*Id.*)  Plaintiffs allegedly "did not agree that the documents are 'confidential,'

16   nor did they agree to a blanket protective order," but nonetheless cooperated so as to obtain

17   documents and information—including the shooting officers' identities.  (*Id.* at 5–7.)

18         On March 5, 2014, the parties filed a joint status report in which Defendants requested a

19   stay of discovery pending the Los Angeles County District Attorney's investigation of the

20   matter.  (Dkt. 17.)  Defendants further asserted that Gardena hadn't then completed its internal

21   affairs investigation of the incident and therefore that the pertinent documents were protected by

22   federal and state law from disclosure.  (*Id.*)

23         On April 5, 2014, Plaintiffs filed a "Notice of Motion and Joint Stipulation to Compel

24   Defendants' Compliance with Rule 26(a)(1)(A) Initial Disclosures."  (Dkt. 20.)  Plaintiffs

25   asserted that as of that date Defendants had refused to cooperate with discovery.  This

26   motion/joint stipulation was the subject of several rounds of supplemental briefing and filings.

27         On May 23, 2014, Plaintiffs applied for an order to show cause why a contempt citation

28   should not issue for the Los Angeles Country Sheriff's Department ("LASD") and its custodian

1  of records for failing to produce subpoenaed documents.  (Dkt. 30.)  Plaintiffs asserted that

2  LASD failed to produce the homicide investigation report and other documents that LASD had

3  purportedly released to the defendants who were the subject of the homicide investigation.  (*Id.*)

4      On May 30, 2014, the Honorable Magistrate Judge Andrew J. Wistrich granted Plaintiffs'

5  motion to compel Defendants' compliance with Rule 26(a)(1)(A) Initial Disclosures.  (Dkt. 34.)

6  The parties were also ordered to lodge either a joint proposed protective order or, if they could

7  not agree, separate proposed protective orders.  (*Id.*)

8      On June 13, 2014, the Magistrate Judge issued the parties' jointly stipulated protective

9  order regarding the homicide book.  (Dkt. 44.)  The protective order stated that the homicide

10  book was "part of an ongoing criminal investigation that is confidential official information."

11  (*Id.* at ¶ 1.)  The protective order also provided that it was entered without prejudice to any

12  party's right to seek an order removing the confidential designation from any documents.  (*Id.* at

13  ¶ 10.)  It further provided that the parties' obligations under the protective order would survive

14  the case's final termination—including by settlement—and that counsel would return all

15  confidential information upon the case's termination.  (*Id.* at ¶¶ 17–18.)

16      On July 10, 2014, Plaintiffs filed an *ex parte* application to have the confidential

17  designation removed from certain pieces of the homicide book—including the video footage of

18  the incident taken from the involved officers' car cameras.  (Dkt. 46.)  On July 12, 2014, LASD

19  filed a brief and declaration stating that the relevant homicide investigation had concluded.  (Dkt.

20  49.)

21      On July 22, 2014, the Magistrate Judge issued an Order directing the parties to attempt to

22  narrow the dispute regarding Plaintiffs' *ex parte* application in light of the news that the

23  underlying homicide investigation had concluded.  (Dkt. 52.)  In response to this Order, on

24  August 15, 2014, Defendants withdrew the confidential designation from written documents at

25  issue in the case.  (Dkt. 64: Defs.' Not., at 2.)  However, Defendants maintained the

26  confidentiality designation as to photos, video, and audiotapes depicting the incident, any police

27  officers or percipient witnesses, the decedent or bloody evidence, and audio or video records of

28  officers' and witnesses' statements.  (*Id.*)

1    The confidentiality of the police car videos was the subject of several further rounds of

2    supplemental briefing and hearings.  *See, e.g.* (Dkts. 118, 126, 128, 153.)

3    On January 30, 2015, Defendants moved for partial summary judgment as to Plaintiffs' §

4    1983 claims.  (Dkt. 220.)  In support of their motion, Defendants sought to file under seal copies

5    of the disputed car camera video footage.  (Dkt. 156.)  In connection with their opposition to the

6    motion for summary judgment, Plaintiffs filed a notice of manual filing asserting that they were

7    filing under seal the car camera footage and stills taken from that footage.  (Dkt. 219.)

8    On February 5, 2015, the parties submitted further supplemental briefing regarding the

9    confidentiality of the car camera videos.  (Dkts. 187–89.)

10    On February 11, 2015, the Court issued an Order granting Defendants' application to file

11    the video footage under seal.

12    On February 12, 2015, Plaintiffs applied *ex parte* for an order vacating or reconsidering

13    the Order granting defendants' application to file the car camera footage under seal.  (Dkt. 226.)

14    On February 17, 2015, Plaintiffs filed a notice of settlement informing the Court that they

15    had reached a tentative settlement with Defendants.  (Dkt. 231.)

16    On February 18, 2015, the Court denied Plaintiffs' *ex parte* application for an order

17    vacating or reconsidering the Order granting defendants' application to file the car camera

18    footage under seal.  (Dkt. 232.)

19    On May 18, 2015, the parties voluntarily dismissed the case with prejudice as to all

20    parties.  (Dkt. 245.)  As of the time of dismissal the Court had not ruled on Defendants' partial

21    summary judgment motion.  On June 8, 2015, the Media Organizations filed the instant motion

22    to intervene in the case for the limited purpose of requesting the unsealing of the car camera

23    footage.  (Dkt. 248.)

24    **III.    LEGAL STANDARD**

25    Courts have historically recognized a general right to inspect and copy judicial records

26    and documents.  *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)

27    (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 & n. 7 (1978)).  The Ninth Circuit

28    recently recognized that "the right of access to public records and proceedings is 'necessary to

1    the enjoyment' of the right to free speech." *Courthouse News Serv. v. Planet*, 750 F.3d 776,

2    786–87 (9th Cir. 2014) (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604

3    (1982)).  It is thus protected by the First Amendment.  *See id.*  This right is rooted in citizens'

4    interests in "keep[ing] a watchful eye on the workings of public agencies." *Kamakana*, 447 F.3d

5    at 1178 (quoting *Nixon*, 435 U.S. at 598).  The media helps the public's vigilance by publishing

6    information about the government's operation.  *Id.*

7         The Ninth Circuit has recognized the media's right to intervene to protect the public's

8    right to access court records..  *See San Jose Mercury News, Inc. v. U.S. Dist. Court–N. Dist. (San*

9    *Jose)*, 187 F.3d 1096, 1103 (9th Cir. 1999).  A nonparty may seek permissive intervention to

10   challenge a protective order under Federal Rule of Civil Procedure 24(b)(2).  *Id.* at 1100–01.

11        A party seeking permissive intervention under Rule 24(b)(2) must show: "(1)

12   independent grounds for jurisdiction; (2) the motion is timely; and (3) the applicant's claim or

13   defense, and the main action, have a question of law or a question of fact in common." *S.E.C. v.*

14   *AOB Commerce, Inc.*, No. CV 07-4507 CAS JCX, 2013 WL 5405697, at *1 (C.D. Cal. Sept. 23,

15   2013) (quoting *San Jose Mercury News*, 187 F.3d at 1100).

16        A court determining the timeliness of a motion to intervene must look to: "(1) the stage

17   of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and

18   (3) the reason for and length of the delay." *San Jose Mercury News*, 187 F.3d at 1100–01

19   (quoting *League of United Latin Amer. Citizens v. Wilson*, 131 F.3d 1297, 1302 (9th Cir.1997)).

20   Courts measure the length of any delay in seeking intervention from "when the intervenor first

21   became aware that its interests would no longer be adequately protected by the parties." *Id.* at

22   1101.

23   **IV.    ANALYSIS**

24        The Media Organizations seek to permissively intervene to move to unseal the car

25   camera videos.  Defendants, who have fought persistently to keep the car camera videos secret,

26   oppose their request.  Defendants challenge both the propriety of allowing intervention and the

27   propriety of unsealing the documents.  The Court addresses each issue in turn.

28        **A.     Motion to Intervene**

7

1                    **1.     Jurisdiction**[2]

2            Defendants assert that this Court should decline to exercise jurisdiction over the

3    intervenors' motion because it purportedly raises an issue under the California Public Records

4    Act, which purportedly exempts from disclosure "investigative files."  Defendants quixotically

5    assert that this Court should remand this case, which was originally filed in this Court, to state

6    court.  Unsurprisingly, Defendants fail to cite to any case directly supporting their argument.  To

7    "remand" a case means "[t]o send [it] back to the court or tribunal from which it came for some

8    further action."  REMAND, Black's Law Dictionary (10th ed. 2014).  Because this case

9    originated before this Court, it can't be "remanded" back to state court.  Moreover, even if the

10   Court were to construe Defendants' argument as a request to transfer the case, the argument

11   would still fail because a federal court cannot transfer a case originally filed in federal court to

12   state court.  *See Wors v. Sling Med., Inc.*, No. 10-CV-0106-MJR, 2010 WL 1963201, at *3 (S.D.

13   Ill. May 14, 2010).

14           Moreover, this Court had jurisdiction over the underlying action because it arose under

15   federal law.  28 U.S.C. § 1331.  Accordingly, federal rather than state law of privilege applies.

16   *See Garrett v. City & Cnty. of San Francisco*, 818 F.2d 1515, 1519 n.6 (9th Cir. 1987) (rejecting

17   argument that documents were protected by state-created privilege because federal common law

18   of privilege controlled in a case arising under federal law).

19           Alternatively, Defendants' argument could be construed as a motion to abstain.

20   However, Defendants fail to cite to any applicable abstention doctrine.  Moreover, the Ninth

21   Circuit recently rejected the argument that a federal district court should abstain from deciding

22   whether a news service had a right to access certain state court records.  *Courthouse News*

23   *Servs.*, 750 F.3d at 783–93.  The Court found that abstention would not be proper under either

24   *O'Shea v. Littleton*, 414 U.S. 488 (1974), or *Railroad Commission of Texas v. Pullman Co.*, 312

25   U.S. 496, (1941).  *Courthouse News Servs.*, 750 F.3d at 783–93.  As in *Courthouse News*

26

27   _____
     [2]  Defendants do not contest that the Media Organizations' claim shares a common question of
     law or fact with the main action; nor could they—the Media Organizations seek to pick up the
28   torch from where Plaintiffs left it and to continue their pursuit to bring the car camera videos to
     light.

1   *Services*, the Media Organizations assert a "First Amendment right of access to judicial and

2   other public proceedings." *Id.* at 784.  "Though the government may sometimes withhold

3   information without violating the expressive rights protected by the First Amendment, the First

4   Amendment right of access to public proceedings—where it applies—is inextricably intertwined

5   with the First Amendment right of free speech." *Id.* at 785.  Thus, as with other First

6   Amendment claims, the Media Organizations' motion raises issues of "particular federal

7   concern." *Id.*  Nor is this a case with "exceptional factors" favoring abstention. *Id.* at 784.

8   Therefore the typical rule that federal Courts should not invoke *Pullman* abstention in First

9   Amendment cases applies. *Id.* at 785.  Moreover, an order unsealing documents previously filed

10  with this Court "poses little risk of an 'ongoing federal audit' or 'a major continuing intrusion of

11  the equitable power of the federal courts into the daily conduct of state . . . proceedings." *Id.* at

12  792 (alteration in original) (quoting *O'Shea*, 414 U.S. at 500, 502).  Thus *O'Shea* abstention

13  doesn't apply. *Id.*

14       For the aforementioned reasons, the Court has and should exercise jurisdiction over the

15  Media Organizations' motion.

16                    **2.      Timeliness**

17       Defendants assert that the Media Organizations' motion is untimely.  However, the

18  Media Organizations' motion was filed less than four months after Plaintiffs filed a notice of

19  settlement.  Given Plaintiffs' consistent efforts to prevent the car camera footage from remaining

20  sealed, the earliest point at which the Media Organizations first became aware that the parties'

21  would no longer adequately protect their interests was when Plaintiffs filed their notice of

22  settlement in February 2015.  A four month delay is not particularly long, especially given that

23  the case was still pending during three of those months. *See, e.g.*, *Beckman Indus., Inc. v. Int'l*

24  *Ins. Co.*, 966 F.2d 470, 476 (9th Cir. 1992) (affirming order permitting intervention two years

25  after settlement).

26       While the case had already settled and been dismissed, this does not bar a finding of

27  timeliness.  Courts have found a motion to intervene timely even where a non-party intervenes

28  years after the litigation concluded to challenge a protective order. *See Blum v. Merrill Lynch*

1    *Pierce Fenner & Smith Inc.*, 712 F.3d 1349, 1353 (9th Cir. 2013).

2          Moreover, there would be no prejudice to the parties by allowing intervention.  The

3    underlying case has settled and thus the Media Organizations' intervention would have little

4    effect on the original parties' underlying rights.  Additionally, Plaintiffs seek to join the

5    intervenors' motion to unseal the videos, and thus clearly would not be prejudiced.  Defendants'

6    argument that they would be prejudiced because they relied on the protective order in settling the

7    case is inapt.  *Id.* at 1354.  The Ninth Circuit has already considered and rejected this argument.

8    *Id.*  Moreover, reliance on a blanket protective order, such as the one at issue in this case, is less

9    because it is inherently overinclusive.  *Beckman*, 996 F.2d at 476.

10          For the aforementioned reasons, the Court FINDS the Media Organizations' motion

11   timely.

12                    **3.      Conclusion**

13          The Media Organizations' motion to intervene is timely and shares a common legal or

14   factual question with the underlying action.  Moreover this Court has jurisdiction over the Media

15   Organizations' request.  The Court thus GRANTS the motion to intervene.

16          **B.      Request to Unseal Videos**

17          The Media Organizations argue that the videos should be unsealed because the blanket

18   protective order contained no specific finding of a compelling reason to seal the videos and

19   because the Court's Order granting Defendants' application to file the videos under seal was

20   procedurally deficient because the Court failed to articulate a basis for its ruling.  As discussed

21   below, the Court concludes that the videos should be unsealed.

22                    **1.      Legal Standard**

23          The right to access judicial records is not absolute.  *Kamakana*, 447 F.3d at 1178.  A

24   narrow class of documents is exempt from the public's right of access because these records

25   have "traditionally been kept secret for important policy reasons."  *Id.* (quoting *Times Mirror*

26   *Co. v. United States*, 873 F.2d 1210, 1219 (9th Cir.1989)).  Only grand jury transcripts and

27   warrant materials in the midst of a pre-indictment investigation have been deemed such

28   traditionally secret documents.  *Id.*

1    Unless a court record is one traditionally kept secret, courts begin from a strong

2    presumption favoring access.  *Id.*  Thus a party seeking to seal a court record bears the burden of

3    overcoming this strong presumption by meeting the "compelling reasons" standard.  *Id.* (citing

4    *Foltz v. State Farm Mutual Auto. Insurance Company*, 331 F.3d 1122, 1135 (9th Cir.2003)).

5    Because this strong presumption favoring access applies to dispositive pleadings, including

6    motions for summary judgment and related attachments, the compelling reasons standard applies

7    to motions to seal such documents.  *Id.* at 1179.

8    This standard requires a party to articulate "compelling reasons supported by specific

9    factual findings that outweigh the general history of access and the public policies favoring

10   disclosure, such as the public interest in understanding the judicial process."  *Id.* at 1178–79

11   (internal quotations and citations omitted).  The Court must "conscientiously balance[] the

12   competing interests of the public and the party who seeks to keep certain judicial records secret."

13   *Id.* at 1179 (internal quotation marks omitted) (citing *Foltz*, 331 F.3d at 1135).  Generally,

14   sufficiently compelling reasons exist when "court files might have become a vehicle for

15   improper purposes, such as the use of records to gratify private spite, promote public scandal,

16   circulate libelous statements, or release trade secrets."  *Id.* (internal quotation marks omitted)

17   (quoting *Nixon*, 435 U.S. at 598).  "The mere fact that the production of records may lead to a

18   litigant's embarrassment, incrimination, or exposure to further litigation will not, without more,

19   compel the court to seal its records."  *Id.*; *see also Foltz*, 331 F.3d at 1136.

20   In addition to finding the "compelling reasons" standard met, the Court must also meet

21   certain procedural requirements before sealing court records.  In order for a Court to seal court

22   records, it must "articulate the factual basis for its ruling, without relying on hypothesis or

23   conjecture" *Kamakana*, 447 F.3d at 1179 (quoting *Hagestad v. Tragesser*, 49 F.3d 1430, 1434

24   (9th Cir.1995)).

25          **2.      Application**

26   The videos at issue in this case were sealed pursuant to a stipulated protective order with

27   the understanding that the decision to seal the videos was still subject to challenge.  Plaintiffs

28   sought to have the videos filed on the public docket from very early in the litigation until they

11

1   settled their claims. They stipulated to the protective order at issue against the backdrop of

2   defendants' apparent refusal to provide even the names of the shooting officers during discovery.

3   Even after the case has settled, Plaintiffs seek to join the Media Organizations' motion to

4   intervene and unseal the videos.

5         The Court's rationale for sealing the subject videos was the parties' stipulated protective

6   order—entered against the backdrop of stalled litigation. However, the parties cannot

7   contractually agree to deprive the public of its strong First Amendment interest in accessing

8   these videos, which were filed in connection with a dispositive motion. Defendants assert that

9   the videos should remain sealed because they agreed to settle the case for $4.7 million—an

10  amount above their liability insurance policy—specifically because they expected the protective

11  order to continue and the videos to remain secret.

12        However, Defendants' argument backfires here—the fact that they spent the city's

13  money, presumably derived from taxes, only strengthens the public's interest in seeing the

14  videos. Moreover, Defendants cannot assert a valid compelling interest in sealing the videos to

15  cover up any wrongdoing on their part or to shield themselves from embarrassment. The only

16  valid privacy interest in this case belongs to the Plaintiffs, who have made abundantly clear that

17  they wish the videos to be made available to the public. Moreover, while the videos are

18  potentially upsetting and disturbing because of the events they depict, they are not overly gory or

19  graphic in a way that would make them a vehicle for improper purposes.

20        Additionally, Defendants and *amici curiae* California State Sheriffs' Association,

21  California Police Chiefs's Association, and the California Peace Officers' Association raise

22  policy issues about how a decision to unseal the video footage could impact the debate over

23  police use of body worn cameras. Nevertheless, this is a political issue not relevant to the legal

24  considerations here at play.

25        **C.**    **Request to Stay the Order Unsealing Videos**

26        Defendants ask the Court to briefly stay enforcement of any order unsealing the videos so

27  they can have time to appeal. However, "[a] stay is not a matter of right, even if irreparable

28  injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (*quoting Virginian R.*

*Co. v. United States*, 272 U.S. 658, 672 (1926)).  Instead, the party seeking the stay bears the

burden of showing that a stay is justified based on four factors:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Id.* at 433–34.  Here Defendants do not even attempt to show that a stay is justified.  Accordingly

the Court DENIES Defendant's request to stay enforcement of this Order.

## V.     ORDER

1.      For the aforementioned reasons, the Court GRANTS the Media Organizations' motion and UNSEAL the video footage.[3]

2.      For the aforementioned reasons, the Court DENIES Defendants' request to impose a short stay on the order unsealing the footage so they can appeal it to the Ninth Circuit.

**IT IS SO ORDERED.**

Dated: July 14, 2015

STEPHEN V. WILSON
United States District Judge

---

[3]  In light of the foregoing, the Court need not decide whether Plaintiffs may properly join the Media Organizations' intervention.

13